(No. 56185.—)

INTERLAKE, INC., Appellant, v. THE INDUSTRIAL
COMMISSION *et al* (Frieda Bridgeforth, Appellee).

*Opinion filed February 4, 1983.—Rehearing
denied April 8, 1983.*

Jeremy P. Sackmann, of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant.

Mark F. Cyr, of Peter F. Ferracuti & Associates, of Ottawa, for appellee.

JUSTICE WARD delivered the opinion of the court:

This appeal is from a judgment of the circuit court of Livingston County, which confirmed a decision by the Industrial Commission. In the decision, the Commission affirmed and adopted an arbitrator's award of lifetime benefits to Frieda Bridgeforth, the widow of Henry Bridgeforth, who died while returning home from work at a factory of Interlake, Inc., in Pontiac. Interlake appealed from the circuit court's judgment directly to this court under Rule 302(a)(2) (73 Ill. 2d R. 302(a)(2)).

Henry Bridgeforth died on October 4, 1976, at the age of 63. Frieda and he had been married for 33 years, and they had eight children. Two of those children were under 18 years at the time of his death. Billy Bridgeforth was born on October 27, 1960. Johnny Bridgeforth was born August 16, 1964. Henry's widow, Frieda Bridgeforth, remarried on February 12, 1977.

Henry Bridgeforth, the decedent, had worked for Interlake for 10 years. He was a "staker," that is he operated a machine that would "stake" end plates. He would pick up the end plates from a basket next to him, insert two rivets into each end plate, and cycle the plates through the machine. In a 10-hour shift, Henry Bridgeforth would cycle about 3,400 pieces or plates.

According to the testimony of other workers, the job involved some bending and lifting, depending upon whether the basket from which one took the plates was placed on the floor or on a table. The plates weighed a pound or a pound and a half, and Henry would pick up five, 10 or even 15 plates at a time. Fred Eppel, an Interlake employee who had operated a staker machine, testified that at times one had to lift five or 10 plates and place them on a chute to load the machine.

Charles Bridgeforth, a son of the decedent, also worked at Interlake. He had worked the staker machine, too, and testified that it was strenuous work. Operating

it, he said, made eight hours seem like 15 hours. He stated that the repetitious moving while standing in a "kind of half way humped position" placed strain on the chest and shoulders. According to Charles, because of the strain the job produced, only a few workers would operate the staker rather than seeking to trade jobs if another job was available. His father complained about the strain on his arms and chest, Charles said, and he tried to rotate job assignments, but the company wanted him to stay on the staker because he was proficient at it.

Jerry Steinbrecker, Henry Bridgeforth's foreman, testified that the decedent was a machine operator, and that he spent about 85% of his working time operating the staker. He minimized the physical effort in operating a staker. Machine operator, he said, was one of the plant's "lightest duty jobs," and the arm movement involved in operating the staker was about as limited as that involved in handwriting.

Henry Bridgeforth drove to work on October 4, 1976. Frieda, his wife, testified that he left home around 2:30 p.m. He had not worked since July 1976. In July, the plant had gone on strike, and in August he underwent bilateral inguinal hernia surgery. He had spent much of the time he was off work lying around the house, Frieda testified. She also testified that prior to October 4, 1976, the decedent would return from work, tired and weak, and complaining of this condition. Too, she stated that for two years prior to October 4, 1976, he had been taking diutensen for high blood pressure. Charles Bridgeforth testified that he had seen his father about two weeks before he started back to work, and that his father appeared to be in fine health.

The decedent's shift began at 3:30 p.m. The temperature in the factory that day was in the upper 70's or low 80's. Charles said that he saw the decedent at about 3:45, and his father looked "happy as a lark." Charles

saw him at 6 o'clock, though, and his father said that he was "running out of gas." At 7 p.m. Charles said that Henry had a yellowish color and was complaining that he felt nauseous and that his chest was tightening up. At 8 p.m., Fred Eppel saw the decedent doubled over with stomach pain. Eppel told the foreman, Jerry Steinbrecker, and Steinbrecker came over. Henry said he felt like vomiting but he was unable to do so.

Steinbrecker testified that at that time Henry had a peculiar grayish color and was perspiring. He was complaining of stomach pain. Steinbrecker soaked some paper towels in cold water, put them on Henry's head and neck, and stayed with Henry until he said he felt better, and until his color was restored. The foreman told him that he could go home and offered to drive him or to have Charles drive him, but Henry decided to drive himself. Steinbrecker walked him to the door at about 8:20 p.m.

Alvin Lindsey, a State trooper, testified that about 9 p.m. he found the decedent's body sitting upright in his automobile about 30 miles from the Interlake plant. The automobile was about 60 yards off the roadway, up against a tree. Tire tracks led straight from the road to the tree with no evidence of braking or maneuvering. The engine was running, the car was in gear, the headlights were on, the radio was playing. Henry's eyes were open, but Lindsey could detect no pulse. He tried CPR without success.

The medical evidence at the hearing consisted of the records of the hospital where the hernia surgery had been performed and the testimony of three physicians. No autopsy had been performed.

Dr. Samuel E. Baz was the decedent's family doctor. He performed the hernia operation in August 1976. During Henry Bridgeforth's convalescence, Dr. Baz found that he had high blood pressure. The elevated pressure,

however, was reduced without medication. Dr. Baz stated that in the case of hypertension from which the decedent suffered, the hypertension is not sustained and could be due to generalized arteriosclerosis of the arteries. Arteriosclerosis is the most common cause of hypertension. Dr. Baz did not, however, make any general finding of arteriosclerosis.

An evidence deposition of Dr. Robert F. Bettasso was admitted without objection. Dr. Bettasso, general practitioner, who also performs surgery, testified that he treated cardiac patients. In his opinion, based upon the symptoms and manner of death, the most likely cause of Henry Bridgeforth's death was an acute myocardial infarction. He said that he treats about 20 acute myocardial infarcts per year, and that upset stomach and nausea frequently are symptoms of posterior or posterior lateral infarcts. The doctor presumed that the decedent had coronary artery disease. He stated that he had examined the electrocardiogram made at the time of the decedent's surgery, and that while the EKG was within normal limits, "there [were] some variations from normal there." The doctor also testified, "My opinion would be that unless—that he had coronary artery disease previously."

The witness stated that the decedent's returning to work, returning to the significant physical activity of his duties, "could have been a precipitating factor for the heart attack." The doctor explained that returning to work "could very definitely [have been] a precipitating factor," because returning to work after a long period of time off would result in much greater strain than that experienced by a person regularly working.

Dr. Bettasso stated that a blood clot in the lung or a stroke were possible but less likely causes of death. Nausea and vomiting are not common symptoms of a stroke.

The deposition of Dr. William Brice Buckingham, an

internist, also was admitted. Testifying for Interlake, Dr. Buckingham disagreed with Dr. Bettasso's opinion that an acute myocardial infarction was the most likely cause of death. Instead, Dr. Buckingham gave three other possible causes, none of which could have been caused by the decedent's work.

The most probable, he said, was a serotonin hormone produced by a carcinoid in the appendix. He based that hypothesis upon the fact that 14 years earlier the decedent had undergone surgery for the removal of the right half of the colon for a growth involving the tip of the appendix. This, the doctor said, suggested a carcinoid. According to that hypothesis, "this serotonin producing carcinoid resulted in a pulmonary hypertension, increased pressure on the right side of the heart, ultimately resulting in a failure of the right side of the heart and the patient's death in the automobile prior to the time that the automobile left the road ***." The doctor stated that about two-thirds to three-fourths of the carcinoids in the appendix are serotonin producing.

Another possible cause, Dr. Buckingham said, was based upon reports in the hospital records of chest X rays showing evidence of fibrosis and some cystic changes of both upper lobes, greater in the right lung than in the left. The possible cause of death was scar carcinoma metastasizing into the central nervous system or adrenal glands or both. The scar carcinoma would be an old tuberculosis lesion that had healed.

A third cause was less likely. That possible cause was "that cystic changes in the right upper lobe on the chest X ray were the result of tuberculosis infection, which was not entirely healed, which had resulted in adrenal glands' atrophy and produced *** adrenal gland insufficiency."

He did not think the decedent died from a myocardial infarction. He noted that the decedent had a normal

electrocardiogram two months before his death, and had no chest pain radiating into the jaw or down the arm. Also, he said that there was no evidence in the hospital records that the decedent was suffering from arteriosclerosis.

He did say, however, that myocardial infarctions are very common. It is possible, he said, to have a myocardial infarction without pain, and to have a normal EKG and an abnormal one a month later. Moreover, he conceded that there was evidence of hypertension in the hospital records, that arteriosclerosis can cause hypertension while hypertension can contribute to arteriosclerosis, that hypertension and arteriosclerosis are frequently associated, and that one can have arteriosclerosis and a normal electrocardiogram. Dr. Buckingham stated, too, that one with arteriosclerosis and an associated condition of hypertension is at risk of having a myocardial infarction.

As to those causes he had suggested, Dr. Buckingham stated that in his 32 years of practice he had become aware of only a half dozen cases of death caused by the production of serotonin. Too, he acknowledged that the radiologists who prepared the X-ray reports did not suggest the presence of scar carcinoma, and that the abnormal shadows in the chest X-rays could have been produced by diseases other than tuberculosis.

Interlake challenges the Industrial Commission's decision on two grounds. First, it argues that the Commission's finding that Henry Bridgeforth's death resulted from an accident arising out of and in the course of his employment is against the manifest weight of the evidence. Second, it contends that it was error to award lifetime benefits to Frieda Bridgeforth.

As to causation, Interlake says that the medical testimony produced six possible causes of death, only one of which could be causally related to the decedent's work.

It argues that the presumption of coronary artery disease cannot be supported and that Dr. Bettasso's opinions as to the cause of death, and that the decedent's work contributed to that cause, were only speculations.

It is clear that it is the Commission's function to resolve conflicts in medical testimony, and that the Commission's findings will not be set aside unless they are contrary to the manifest weight of the evidence. (*E.g., Caterpillar Tractor Co. v. Industrial Com.* (1982), 92 Ill. 2d 30, 37; *Johns-Manville Products Corp. v. Industrial Com.* (1979), 78 Ill. 2d 171, 178.) Here evidence was presented as to the stressful nature of the decedent's work. A physician experienced in the treatment of cardiac patients stated that, considering the symptoms of the decedent, his medical history, and the circumstances of his death, he could give an opinion as to the most likely cause of death, could presume coronary artery disease, and could state that the strain of the decedent's work very definitely may have been a contributing factor in the death. The petitioner need not disprove every other possible cause to establish death by heart attack. (*McLean Trucking Co. v. Industrial Com.* (1978), 72 Ill. 2d 350.) The Commission's finding was not against the manifest weight of the evidence.

Interlake contends, however, that as a matter of law, it was error for the Commission to consider Dr. Bettasso's opinion. Dr. Bettasso's testimony was given to the arbitrator in the form of an evidence deposition. In the hypothetical question presented to the doctor, it was to be assumed that the end plates handled by the decedent weighed five pounds. Evidence at the hearing before the arbitrator established that the plates weighed only one or one and a half pounds. Interlake says that this "obvious distortion of the physical strain" in the work was reversible error, and if the doctor's opinion is properly stricken, there is no evidence to support the Commis-

sion's findings as to the cause of death or its relationship to the decedent's work.

A review of the record shows that Interlake did not raise this issue before the arbitrator, the Commission or the circuit court. (Somewhat ironically, in examining Dr. Buckingham in its evidence deposition, Interlake even "stipulated" that the plates weighed five pounds.) We therefore deem that the issue was waived. (See *District 141, International Association of Machinists & Aerospace Workers v. Industrial Com.* (1980), 79 Ill. 2d 544, 556-57; *David Wexler & Co. v. Industrial Com.* (1972), 52 Ill. 2d 506, 509.) Moreover, the discrepancy is not as important as appears at first blush, for the evidence at the hearing also showed that the decedent would pick up and handle five, 10 or even 15 plates at a time, and that there was other testimony as to the stressful nature of the work.

Interlake's second contention, that it was error to award lifetime benefits to the decedent's widow, involves section 7(a) of the Workmen's Compensation Act (Ill. Rev. Stat. 1975, ch. 48, par. 138.7(a)). That section provides in part:

> "(a) If the employee leaves a surviving a widow, [*sic*] widower, child or children, the applicable weekly compensation rate computed in accordance with subparagraph 2 of paragraph (b) of Section 8, shall be payable during the life of the widow or widower and if any surviving child or children shall not be physically or mentally incapacitated then until the death of the widow or widower or until the youngest child shall reach the age of 18, whichever shall come later; provided that if such child or children shall be enrolled as a full time student in any accredited educational institution, the payments shall continue until such child has attained the age of 25. In the event any surviving child or children shall be physically or mentally incapacitated, the payments shall continue for the duration of such incapacity.
>
> * * *

> In the event of the remarriage of a widow or widower, where the decedent did not leave surviving any child or children who, at the time of such remarriage, are entitled to compensation benefits under this Act, the surviving spouse shall be paid a lump sum equal to 2 years compensation benefits and all further rights of such widow or widower shall be extinguished.
>
> If the employee leaves surviving any child or children under 18 years of age who at the time of death shall be entitled to compensation under this paragraph (a) of this Section, the weekly compensation payments herein provided for such child or children shall in any event continue for a period of not less than 6 years."

Frieda Bridgeforth remarried prior to the arbitrator's and Commission's decisions to award her lifetime benefits, for her use and for the care of her children. At the time of her remarriage, two of the decedent's surviving children were minors and, therefore, entitled to compensation. Interlake argues that we should hold that under section 7(a) the decedent's widow forfeited her "share" by remarriage, and her share then passed to her minor children, who may collect compensation until they reach the age of 18 years.

It is obvious that Interlake's argument is contrary to the plain language of the statute. The statute provides for the payment of death benefits until the widow dies, or until the children reach 18, whichever is *later*. If, however, the widow remarries when *none* of the decedent's children are entitled to compensation, she is to receive a lump sum of two years' compensation and then her rights are extinguished. Under the language of the section, Frieda, as the decedent's widow, is entitled to benefits until she dies, because she did not remarry at a time when none of the decedent's children were entitled to support. There simply is no provision in the statute for terminating a widow's benefits upon remarriage when there remain minor children entitled to support.

Interlake argues, however, that such a consequence

must not have been the legislature's intention. Citing Professor Larson's treatise, it points out that workers' compensation statutes of various States provide that, upon a widow's remarriage, the balance of the compensation to which she is entitled goes to the children or other dependents. 2 A. Larson, Workmen's Compensation sec. 64.40 (1982).

Remarriage, Interlake contends, creates a new legal relationship for a widow, and she becomes legally dependent upon a different spouse. She should, therefore, lose the right to collect benefits just as she would at her death. The legislature must not have intended, Interlake says, to provide her with a windfall.

The only support for its contention is *Newman v. State* (1944), 14 Ill. Ct. Cl. 17, a decision of the State's claims court, which of course, is not binding on this court. There the Court of Claims modified an award to a widow. It ordered that the widow's award be terminated because she had remarried, and that the award should be made payable to the decedent's minor daughter. The statute in force at the time contained a provision in section 7(a) similar to that which now appears in the Act. It provided: "Any right to receive compensation hereunder shall be extinguished by the remarriage of a widow, if the deceased did not leave him surviving any child or children whom he was under legal obligations to support at the time of said injury." Ill. Rev. Stat. 1943, ch. 48, par. 144(a).

Interlake's argument is not convincing. A court's function in statutory interpretation is to give effect to the intention of the legislature. (*People v. Beam* (1979), 74 Ill. 2d 240, 242; *Merrill v. Drazek* (1975), 62 Ill. 2d 1, 6.) In ascertaining the legislative intent, we look first to the language of the statute, and if the legislature's intent may be ascertained from the language it used, it will be given effect without resort to other aids in con-

struction. *People v. Robinson* (1982), 89 Ill. 2d 469, 475-76; *Town of the City of Peoria v. O'Connor* (1981), 85 Ill. 2d 195, 203.

Here the language is clear. The legislature could have included a provision terminating a widow's benefits in a case where she remarries with children entitled to support, but it did not. It is, of course, not our place to state what course we consider the legislature should have taken. *In re Griffin* (1982), 92 Ill. 2d 48, 52.

For the reasons given, the judgment of the circuit court is affirmed.

*Judgment affirmed.*

CHIEF JUSTICE RYAN took no part in the consideration or decision of this case.