DEAN FOODS COMPANY, Petitioner, v. THE ILLINOIS POLLUTION
CONTROL BOARD, *et al.*, Respondents.

Second District   No. 2—84—1125

Opinion filed April 7, 1986.

Richard J. Kissel, Therese Yasdick, and Daniel F. O'Connell, all of Martin, Craig, Chester & Sonnenschein, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (William J. Barzano, Jr., and Nancy J. Rich, Assistant Attorneys General, of Chicago, of counsel), for appellees.

JUSTICE HOPF delivered the opinion of the court:

Dean Foods Company (Dean) appeals from a decision of the Illinois Pollution Control Board (PCB or Board) pursuant to section 1041 of the Illinois Environmental Protection Act (the Act) (Ill. Rev. Stat. 1983, ch. 111½, par. 1041) which provides that review of Board decisions shall be afforded directly in the appellate court. Dean seeks review of a PCB affirmance of an Environmental Protection Agency (EPA or Agency) action which imposed a condition on Dean's NPDES (National Pollutant Discharge Elimination System), or waste water discharge, permit.

Dean operates its largest dairy processing plant on a 13-acre site in Chemung. The plant maintains its own waste water treatment facility on three acres at the west end of Dean's property. The waste water treatment consists of an activated sludge process followed by two polishing lagoons and a rock filter. The facility is bounded on the west side by the Piscasaw Creek and discharges its treated effluent into the creek through an outfall ditch.

Dean's treatment plant was originally built in the early 1950's as an activated sludge system. In the late 1960's, Dean segregated the waste water stream from the stream used for cooling purposes (noncontact cooling water) in order to reduce the flow through the treatment plant. The two streams were recombined after the waste water was treated. Two polishing lagoons were also added to provide advanced treatment. Further improvements, including the rock filter, were made to the plant in the 1970's.

The system Dean is now using is conducive to the growth of algae

in the lagoons. The effluent, which has already been partially treated in an activated sludge process, lets sun shine through the water which in turn stimulates the growth of algae on the bottom of the lagoons. The algae becomes a major component of the TSS (total suspended solids) in the effluent. Dean is occasionally unable to meet the TSS standard set by the EPA.

In September 1973 Dean requested permission from the Agency, pursuant to the Dilution Rule (Rule 401 of the Board's regulations, now codified as 35 Ill. Adm. Code sec. 304.102) to sample its effluent for compliance with effluent limitations at a point after the treated waste water stream was combined with the cooling water stream and just prior to discharge into the Piscasaw Creek.

In its reply, the Agency noted first that its regulations prohibit dilution of wastes for the purpose of complying with effluent standards. Then the Agency stated that it could designate a sampling point such as that requested by Dean, but only after it had determined that the best degree of treatment of waste water consistent with technological feasibility, economic reasonableness, and sound engineering judgment (BDT) had been provided prior to sampling as required by the Dilution Rule. The Agency requested more information in order to make a determination about BDT at the Chemung plant. Dean provided the necessary information, and the Agency replied by letter that Dean's treatment was yielding results that were

> "certainly within the intent of the regulations to provide treatment consistent with technological feasibility. Your letter suggests that the cooling water had not been introduced for the express purpose of diluting the effluent from the waste-water treatment facilities and is consistent with Rule 401(a) of the Illinois water pollution regulations."

Subsequently, in 1975, the Agency issued Dean a permit allowing sampling after the two streams were combined. This permit was renewed in 1977. Between 1973 and 1981, Agency representatives collected samples at the point designated in the permit. At no time was it recommended or even suggested that Dean should be sampling before mixture.

In 1981 Dean's permit was due for renewal. The first draft permit, dated April 17, 1981, as well as the second draft, retained the earlier sampling point. In the final draft, however, the sampling point was changed to require sampling of the treated waste water before any mixture with the cooling water. This draft was dated July 7, 1981. After it received the July draft permit, Dean met with Agency officials to discuss the permit condition. Dean also objected in writing

to the condition, directed its engineers to give information to the Agency on the background of the existing sampling point and on the effectiveness of Dean's treatment system, and offered to provide any further information needed by the Agency to make its determination. The Agency made no response and on September 2, 1981, the final permit, containing the challenged condition, was issued.

Dean appealed from the permit condition to the PCB and a hearing was held before a hearing officer. At the hearing Dean presented evidence that it was providing BDT to its waste water before mixing it with cooling water. This evidence had not previously been presented to the Agency and the Agency objected to its introduction at the Board hearing. The hearing officer allowed the evidence to be entered on the record subject to a Board ruling on admissibility.

Mark Schollenberger, an Agency employee who prepared both the draft and final Dean permits, testified at the hearing after his written narrative statement was admitted as evidence. Schollenberger's written statement established that he was the engineer who reviewed Dean's 1981 application for permit renewal. In the statement, 35 Ill. Adm. Code sec. 304.12(a) was paraphrased as follows:

"In order for a treatment works or wastewater source to use dilution to meet effluent standards, it must provide the best degree of treatment consistent with technological feasibility, economic reasonableness and sound engineering judgement."

The statement then explained that Schollenberger raised the issue of whether Dean was providing BDT because of the fact that they were sampling after the treated waste water was diluted by the cooling water and, even with this dilution, Dean's effluent was violating the effluent standards for suspended solids. The statement concluded that the Agency did not have enough information to determine that Dean was providing BDT and set forth what data was needed to make that determination.

Schollenberger asserted both in his written statement and on cross-examination that, prior to issuing the final permit, the Agency told Dean it needed additional information. He acknowledged, however, that the request was never made in writing. Dean denied that it was ever informed that more information was required.

On cross-examination Schollenberger also testified that the Agency had no written guidelines beyond the Dilution Rule itself as to what constitutes BDT, that he changed his position as to the location of Dean's sampling point because Dean had not supplied sufficient proof that they were providing BDT, that the only guidelines he followed were contained in the Dilution Rule, that he had relied on the

determination made about BDT by the Agency in 1973 but then decided something more recent was needed, that the additional data he required were his personal conclusions as to what was needed, and that one of the criteria he had looked for was impact on the water quality of the receiving stream which was not a criteria called for by the Dilution Rule for determining BDT. Finally, Schollenberger testified that some type of filtration might enable Dean to improve its waste water treatment but that he did not know of any particular new or different method that would accomplish that task. On redirect, Schollenberger said the additional data he wanted to see from Dean was based on discussions with supervisors and other engineers within the Agency.

Schollenberger's credibility was challenged on cross-examination, and the hearing officer found his answers "slow, uncertain and generally non-responsive." The hearing officer added that in his opinion Schollenberger's "difficulty in making a proper response was that the witness himself was uncertain as to the basis for his earlier decisions."

On August 22, 1984, the Board affirmed the Agency's action, labeled as error the admission of the challenged evidence, and held that the Agency was not estopped (as Dean had urged in its trial brief) from changing the sampling point. Dean then filed this appeal.

On appeal, Dean contends that: (1) the PCB incorrectly interpreted its own regulation controlling dilution of effluent; (2) the PCB erroneously excluded evidence offered by Dean at the PCB hearing; (3) the evidence before the Board weighed so heavily in Dean's favor that a Board decision affirming the Agency action could never stand; (4) the Board erred in failing to find that the Agency was estopped from changing Dean's sampling point.

The first issue raised by Dean is the proper interpretation of the Dilution Rule (35 Ill. Adm. Code sec. 304.102), which states:

"a) Dilution of the effluent from a treatment works or from any wastewater source is not acceptable as a method of treatment of wastes in order to meet the standards set forth in this Part. Rather, it shall be the obligation of any person discharging contaminants of any kind to the waters of the state to provide the best degree of treatment of wastewater, consistent with technological feasibility, economic reasonableness and sound engineering judgment. In making determinations as to what kind of treatment is the 'best degree of treatment' within the meaning of this paragraph, any person shall consider the following:

1) What degree of waste reduction can be achieved by process change, improved housekeeping and recovery of individual waste components for reuse; and

2) Whether individual process wastewater streams should be segregated or combined.

In any case, measurement of contaminant concentrations to determine compliance with the effluent standards shall be made at the point immediately following the final treatment process and before mixture with other waters, unless another point is designated by the Agency in an individual permit, after consideration of the elements contained in this section. If necessary the concentrations so measured shall be recomputed to exclude the effect of any dilution that is improper under this Section." 35 Ill. Adm. Code sec. 304.102, formerly Board Rule 401(a).

In its opinion and order, the Board cited the terms of the Dilution Rule itself, and language from the 1972 Board opinion which adopted the rule, as support for several propositions. First, the opinion asserted that the adopting Board in 1972 intended to prohibit dilution as a means of complying with contaminant standards. Second, the opinion explained that the only exception to this prohibition might occur when it was desirable to combine two or more different waste streams, prior to treatment, in order to increase the effectiveness of treatment or to treat more economically. Third, according to the opinion, the decision about the desirability of combining separate waste streams was left to "engineering judgment." The opinion then stated: "The rule clearly does not create a right to dilute a waste stream with a non-waste stream even if 'best degree of treatment' is provided."

The Board characterized Dean's position as a "contention that they had earned the right to dilute as a reward for providing the 'best degree of treatment,' " and asserted that the ultimate effect of combining the streams was dilution. The opinion noted that even with the dilution Dean was unable to meet certain effluent limitations in its permit and concluded that the permit condition relocating the sampling point was reasonable and correct.

On appeal to this court, Dean contends that the Board's interpretation of the Dilution Rule is incorrect and urges that the mixing of its treated waste water and noncontact cooling water is permissible because it is providing the best degree of treatment prior to mixing.

■ The construction of an administrative rule or regulation requires a reviewing court to look to the construction given the rule by the Agency. (*Olin Corp. v. Pollution Control Board* (1977), 54 Ill.

App. 3d 480, 483, 370 N.E.2d 3.) Although an agency's construction of its rules is not binding on them, courts will give great weight to an agency's construction and actual application of its own rule, unless the agency's interpretation is plainly erroneous or inconsistent with long-settled constructions (54 Ill. App. 3d 480, 483, 370 N.E.2d 3), or the agency's prior interpretations have been inconsistent. (*Environmental Protection Agency v. Pollution Control Board* (1983), 118 Ill. App. 3d 772, 781, 455 N.E.2d 188.) In the instant case, Dean urges that the PCB's interpretation of the Dilution Rule contradicts its prior consistent interpretations and cites two earlier Board opinions as support. The Board, on the other hand, maintains that it has long been Board precedent to prohibit mixtures such as the one at issue and also cites two PCB opinions as support.

Our review of the PCB opinions cited by the parties persuades us that, while the Board has not always been clear and complete in its application of the Dilution Rule, its precedents generally indicate a tendency to allow dilution if a petitioner is providing BDT. *Allied Chemical Corp. v. Environmental Protection Agency* (Feb. 28, 1973), 11 PCB Op. 379 (No. 73—382), cited by Dean, approved a compliance plan which allowed dilution of treated effluent with cooling water. The Agency itself in that case advised the Board that Allied's plans for compliance would assure BDT for petitioner's waste streams. The Board made clear that its decision involved striking a balance between environmental control and economic reasonableness and that it was relying heavily on the Agency's evaluation of that particular case. In 1975 Allied again sought certain variations and in *Allied Chemical Corp. v. Environmental Protection Agency* (May 8, 1975), 16 PCB Op. 615 (No. 75—69), the Agency sought to impose an effluent standard on Allied but without the dilution that had been allowed in 1973. The Board expressly noted that when Allied's compliance plan was considered in 1973, "[i]t was clear that Allied's program would involve some dilution" and that the Board was fully aware that the program would incorporate BDT but that "even with such treatment, some dilution would still be necessary." The Board refused to adopt the Agency's recommendation and allowed the dilution.

The cases cited by the Board, *Revere Copper & Brass, Inc. v. Illinois Environmental Protection Agency* (Sept. 23, 1983), 54 PCB Op. 81 (No. 80—117), and *Illinois Nitrogen Corp. v. Environmental Protection Agency* (Dec. 3, 1981), 44 PCB Op. 139 (No. 80—144), while not as clear in the precedent they set as are the *Allied* cases, certainly do not weaken Dean's argument. The *Revere* Board refused to allow sampling after mixture of several waste streams into a pond,

but also specifically noted that Revere had made no showing that its proposed system would provide BDT. In *Illinois Nitrogen*, sampling after mixture of several waste streams was not allowed because the Board thought such sampling would encourage use of dilution as a method of treatment. The BDT issue was not even raised in the case because the request for the downstream sampling point came not from the petitioner but from the Agency.

Taken together, the cases presented to us by both parties indicate that the PCB's interpretation of the Dilution Rule in the instant case is not consistent with its prior interpretations. It will be weighed accordingly.

The Board's present interpretation of the Dilution Rule is also inconsistent with the past interpretation of the rule by the Agency (as distinct from the Board). As noted above, in *Illinois Nitrogen Corp. v. Environmental Protection Agency* (Dec. 3, 1981), 44 PCB Op. 139 (No. 80—144), it was the Agency which requested sampling of treated waste streams after mixture and just prior to final discharge. Moreover, it is clear even from the case before us that the Agency allows dilution when BDT is provided. Dean was issued its 1975 and 1977 permits after showing that its effluent was receiving BDT. The Board now appears to dismiss the permission given to Dean in 1973 to sample after mixture as either an innocent or intentionally caused misunderstanding. But we have carefully reviewed the 1973 correspondence between Dean and the Agency, as well as documentation provided by Dean at the time, and find that it reflects a thorough and clear understanding on the part of the Agency of what Dean was requesting.

The Board also implies in its opinion that in 1973 the Agency may have considered the cooling water a "waste" stream, and allowed the mixture on the basis that both streams were waste streams. However, acceptance of such a mixture would be inconsistent with the Board's opinion that the exception to the prohibition on dilution was only for mixture of waste streams *prior to* treatment. Here, mixture occurs *after* treatment. Thus, the Board's suggestion begs the question. Furthermore, the Agency was collecting samples at the post-mixture sampling point for eight years without ever informing Dean that sampling should be done prior to mixture.

Even the evidence of what transpired during 1981, after Dean applied for permit renewal, indicates that the Agency did not absolutely prohibit dilution. The paraphrase of the Dilution Rule in Mark Schollenberger's written narrative statement clearly says that, in order to use dilution, a treatment works must provide BDT. Schollenberger testified that he reconsidered Dean's sampling point because he had

inadequate information regarding BDT at the Chemung facility. There is no doubt that in the present case the PCB has deviated from the Agency's interpretation of the Dilution Rule.

Both parties claim that the plain meaning of the Dilution Rule favors their position. Dean argues that, by its terms, paragraph (b) of the rule provides specifically for sampling after mixture of treated waste water with other waters, including cooling waters, when certain conditions have been met. The Board asserts that the purpose of the rule is to allow only for the mixture of various waste streams prior to treatment. The disputed part of paragraph (b) states:

> "[M]easurement of contaminant concentrations to determine compliance with the effluent standards shall be made at the point immediately following the final treatment process and before mixture with other waters, unless another point is designated by the Agency in an individual permit."

■ We do not find that the term "other waters" in subparagraph (b) must be limited to waste water, as the board insists, even when considered in the context of the entire rule. The disputed phrase states that sampling must be done "immediately *following* the final treatment process and before mixture with other waters." (Emphasis added.) While treated effluent might be sampled and then combined with other treated effluent streams before it is discharged to the waters of the State, such effluent might just as well be sampled and then immediately discharged, and thus mixed, with waters other than treated effluent streams. Respondents seem to attempt to superimpose the *purpose* of the exception as set forth by the Board (*i.e.*, to allow *pre*-treatment mixing of waste streams) on the language of paragraph (b) which clearly refers to post-treatment waters.

Since "other waters" is not limited to waste water, the exception could mean, as Dean claims it does, that it allows sampling after mixture with clean waters, or it could mean that the Agency may allow various waste water streams to be mixed, then treated and then sampled, or it could have both meanings. Thus, while the Dilution Rule does not on its face prohibit Dean's challenged practice, neither does it make a special provision for post-treatment dilution.

■ ■ Since the Dilution Rule is not without ambiguity on its face, the court must look beyond the Rule itself for guides to its proper interpretation. An administrative agency's rules are interpreted according to the same rules which apply to statutes. (*Continental Grain Co. v. Pollution Control Board* (1985), 131 Ill. App. 3d 838, 840, 475 N.E.2d 1362.) Where statutory language is ambiguous, it is appropriate to examine the legislative history of the statute. (*Board of*

*Commissioners v. County of Du Page* (1983), 119 Ill. App. 3d 1085, 457 N.E.2d 1291, *rev'd on other grounds* (1984), 103 Ill. 2d 422, 469 N.E.2d 1370.) The parties to the case at bar have provided extensive legislative history of the Dilution Rule in the form of PCB newsletters and opinions, including the opinion in which the Board adopted the present rule. In the interest of judicial economy, we summarize that history here. The materials unmistakably reflect the continuing intent of the Board that dilution should not be used as an alternative to treatment of wastes. They also indicate that the present rule reflects a conscious change by the Board from a position which flatly and absolutely prohibited dilution of any sort to utilization of a standard which all dischargers must meet. The standards may, under certain conditions, allow dilution for reasons other than treatment. Dilution as a deliberate method of treatment remains forbidden. The materials also make clear that this flexibility was built into the rule to allow for future technology and economic considerations.

Two items of legislative history are particularly noteworthy. Both indicate that the Board realized that some dilution would occur under its newly adopted standard. In PCB Newsletter No. 27, July 29, 1971, the Board explained the changes in the rule and the reasons for these changes, and described its new approach requiring BDT consistent with technological feasibility, economic reasonableness and sound engineering judgment. The Board then added: "If that rule is followed it may very well be that dilution will be used by dischargers. But by then we will have done everything that we know how to do to take contaminants out of the waterways." In *In re Effluent Criteria* (Jan. 6, 1972), 3 PCB Op. 401 (R. 70—8), where the Dilution Rule was adopted, the Board discussed the evils of relying on dilution and stated that it is better to require dischargers to use treatment to "reduce as much as practicable the total quantities of contaminants discharged to the waters before resorting to dilution either before or after discharge."

The statements quoted above strongly suggest that the adopting Board recognized that relaxation of the prohibition on dilution would result in some use of dilution. It appears that the Board felt it was imperative to implement the BDT approach and was willing to tolerate some dilution after the best treatment had already been given to the water. To this extent, the history of the Dilution Rule shows an intent, if not to allow, at least to tolerate, minimum dilution after the water has been treated as thoroughly as is feasible.

In summary, the Dilution Rule on its face does not absolutely prohibit sampling after the mixture of non-contact cooling water with

waste water which has already received the best degree of treatment. Furthermore, the history of the rule shows an intent to discourage, but tolerate, post-treatment dilution of waste water, provided the treatment has been the best possible. The allowance of dilution prior to sampling by the Agency in the 1975 and 1977 Dean permits was consistent with the history of the rule. The PCB's position in the case now before the court is a departure from the past interpretation of the rule by both the Agency and the PCB itself. We conclude that the PCB incorrectly interpreted the Dilution Rule (35 Ill. Adm. Code sec. 304.102) to absolutely prohibit designation of a sampling point after the mixture of treated effluent with cooling water.

Dean's second assignment of error is that the Board incorrectly excluded the evidence Dean offered at the hearing to prove that the Chemung plant was providing BDT. The evidence consisted of information which had not been presented to the Agency before the final permit issued. The Agency objected to Dean's introduction of this evidence on the basis that the scope of evidence in a permit appeal was limited to facts before the Agency at the time the permit was issued. Dean argued that a Board procedural rule (35 Ill. Adm. Code sec. 105.102(b)(8)) allowed for the admission of its new evidence. Section 105.102(b)(8) states:

"The hearings before the Board shall extend to all questions of law and fact presented by the entire record. The Agency's findings and conclusions on questions of fact shall be prima facie true and correct. If the Agency's conclusions of fact are disputed by the party or if issues of fact are raised in the review proceedings the Board may make its own determination of fact based on the record. If any party desires to introduce evidence before the Board with respect to any disputed issue of fact, the Board shall conduct a de novo hearing and receive evidence with respect to such issue of fact."

The hearing officer allowed the evidence to be entered into the record but deferred the question of admissibility to the Board. The Board later found that Dean had disputed before the Agency the factual issue of whether or not it was providing BDT and that, pursuant to its rule in section 105.102(b)(8), a *de novo* hearing before the Board was warranted. Nevertheless, the Board found that the challenged evidence had been improperly admitted because *"de novo"* referred only to the manner in which the Board could look at the issue. The *de novo* rule, according to the Board's interpretation, prohibited Board consideration of evidence that was not part of the record before the Agency. Admission of evidence developed after issuance of the permit was

found to be error.

■ As noted above, an administrative agency's interpretation of one of its own rules should be given substantial weight by a reviewing court unless it is plainly erroneous or inconsistent with past interpretations. (*Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 483, 370 N.E.2d 3.) But when a regulation is clear on its face, the court must give effect to the language of the provision. (*Interlake, Inc. v. Industrial Com.* (1983), 95 Ill. 2d 181, 447 N.E.2d 339.) In the instant case, the PCB appears to have ignored the plain meaning of the *de novo* rule.

■ The first three sentences of section 105.102(b)(8) deal with the role of the record in Board hearings. They state that the hearings must cover all questions of law and fact presented by the record and that when issues of fact are raised the Board may make its own decision based on the record. Then the rule discusses matters beyond the record. It states that if any party desires to "introduce" evidence "before the board," the Board must conduct a *de novo* hearing "and receive evidence." This language clearly refers to evidence being presented directly to the Board and not merely via the record. To interpret this language to mean that a party at a *de novo* hearing is confined to the mere *re*-presentation of evidence already presented and accounted for in the record is not supportable. Such a hearing would amount to merely a "live" review of the record and not be a *de novo* hearing at all. The Board's interpretation would render the rule meaningless.

Moreover, the term "*de novo*" has a well-known legal meaning. Black's Law Dictionary defines a hearing *de novo* as:

"Generally a new hearing or a hearing for the second time, contemplating an entire trial in the same manner in which matter was originally heard and a review of previous hearing. On a hearing 'de novo' court hears matter as court of original and not appellate jurisdiction." Black's Law Dictionary 649 (5th ed. 1979).

American Jurisprudence characterizes *de novo* judicial review of administrative proceedings as:

"[T]rying the matter anew the same as if it had not been heard before and as if no decision had been previously rendered. *** Even though designated an 'appeal,' a review in which the court is not confined to a mere re-examination of the case as heard before the administrative agency but hears the case de novo on the record before the agency and such further evidence as either party may see fit to produce is to be regarded as an

original proceeding." (2 Am. Jur. 2d *Administrative Law* sec. 698 (1962).)

This characterization of a *de novo* proceeding is absolutely consistent with the rule, which first discusses the use of the record and then evidence beyond the record.

Not only do the plain meaning and the commonly accepted legal usage of the term indicate that a *de novo* hearing may go beyond the record to a full evidentiary hearing, but the recent case of *Environmental Protection Agency v. Pollution Control Board* (1985), 138 Ill. App. 3d 550, 486 N.E.2d 293, also supports that interpretation. There, the court affirmed PCB orders which had overturned EPA permit denials. The EPA asserted that the PCB, when reviewing EPA orders, was required to affirm those orders unless they were contrary to the manifest weight of the evidence. The court called this assertion erroneous and described the permitting process involving the EPA and the PCB as an administrative continuum, incomplete until the PCB has ruled. The court noted that at the Agency level there is nothing like a hearing where adversaries submit proofs to a neutral decision maker, and that the EPA is not required to issue findings of fact and conclusions of law, but only reasons for denial which an applicant has not had a chance to challenge. The court then described the PCB hearing as including "consideration of the record before the EPA together with the receipt of testimony and other proofs under the full panoply of safeguards normally associated with the due process hearing." 138 Ill. App. 3d 550, 552, 486 N.E.2d 293, 294.

While it is not clear in the above cited opinion precisely what kind of permit was involved, the court's comments indicate that it was either an NPDES, like the one in this case, or a similar permit which called for a *de novo* hearing. We note that the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1001 *et seq.*) does not require a *de novo* Board hearing for all permits. In fact, the scope of review for specified Board appeal hearings is limited to the record before the Agency. (See, *e.g.*, Ill. Rev. Stat., 1984 Supp., ch. 111½, par. 1040(c), which provides for appeals from permits (or denials thereof) to develop pollution control facilities for the disposal of hazardous waste.) However, where the review is limited to the record, the Act has already provided for a full evidentiary hearing, where all parties can be heard, at the Agency level. (See Ill. Rev. Stat., 1984 Supp., ch. 111½, par. 1039.3, for Agency hearings on permits to develop pollution control facilities for the disposal of hazardous wastes.) In the case of NPDES permits, the Act does not provide for such a hearing by the Agency, but instead requires the Board to grant an appellant a

hearing. (Ill. Rev. Stat. 1983, ch. 111½, par. 1040(a)(1).) The Board's own procedural rules call for the hearing to be *de novo* in nature. (35 Ill. Adm. Code sec. 105.102(b)(8).) The reasoning in *Waste Management* is consistent with the requirements of the Act and supports our interpretation of the *de novo* rule. Furthermore, in light of the procedural scheme described above, *Environmental Protection Agency v. Pollution Control Board* (1983), 118 Ill. App. 3d 772, 455 N.E.2d 188, relied upon by the Board, does not support the Board's position. That case involved not an NPDES permit but a permit for a liquid waste incinerator. Appeals regarding such permits are controlled by section 40(d) of the Act (Ill. Rev. Stat., 1984 Supp., ch. 111½, par. 1040(d)), which limits Board review to the record before the agency.

The PCB opinion in *Olin Corp. v. Illinois Environmental Protection Agency* (Feb. 7, 1982), 45 PCB Op. 389 (No. 80—126), also relied on by the Board, does not support the Board's position that it may only review the Agency record either. In *Olin*, while the Board stressed the import of narrowly construing the *de novo* provision in order to, in effect, avoid forum shopping between the Agency and the Board, it did not assert that the applicant's facts were improperly before it. The Board recognized that there had been no proper hearing on the disputed matter at the Agency level, reversed the Agency, and remanded the permit to the Agency for further action. While we agree that the *de novo* rule should not become a vehicle for forum shopping, we find that in a proper case, it calls for the Board to review matters beyond the record. This is particularly true in light of the very evident intent of the Environmental Protection Act itself to ensure a thorough and unbiased hearing for permit appeals. Dean's BDT evidence should not have been excluded from the PCB hearing.

■■ Dean's third argument is that it presented such overwhelming evidence to the Board that it was providing BDT that the Board's affirmance of the permit condition cannot stand. Dean asks this court to review the evidence and reverse the PCB decision without remanding for further proceedings.

Although Dean presented evidence on the issue, the Board never decided whether or not BDT was being provided at the Chemung facility because it never reached that issue. The bulk of Dean's BDT evidence was the subject of an Agency objection and, as noted above, was held inadmissible by the Board. The Board was aware of the evidence as shown by the statement in its opinion that it had reviewed the entire record of the hearing "including the evidence developed after the final permit was issued." But the Board concluded that, under its interpretation of the Dilution Rule, "this excluded evidence is irrel-

evant to the resolution of this permit appeal." Consequently, even though the Board was aware of Dean's evidence, it never did analyze that evidence in terms of the BDT issue. In light of our own conclusions about the Dilution Rule, we believe the Board should have considered that issue.

The factual determination to be made here involves evaluations and judgments about scientific data, waste water treatment technologies, and engineering methodology, as well as application of highly technical standards. The PCB has the expertise to make such evaluations and applications. (See Ill. Rev. Stat. 1983, ch. 111½, par. 1005(a), which created the PCB and calls for seven "technically qualified" Board members.) This court is not qualified to do so. The PCB should be given the opportunity to inquire into the question of whether or not Dean was providing BDT.

We add a final note regarding the burden of proof in this case. The respondents have repeatedly asserted that the burden on Dean is to prove that the conditions imposed by the Agency are not necessary to accomplish the purposes of the Act and, therefore, were imposed unreasonably and arbitrarily. They insist that Dean has not met this burden. Dean, on the other hand, perceives its burden to be to prove that it is providing BDT to its waste water. We do not find the two concepts incompatible.

Dean must show that it is providing BDT because that is a condition precedent for approval of its post-mixture sampling point. By proving it is achieving BDT, Dean may show compliance with the treatment standard imposed on all dischargers—a standard which was imposed as one method of accomplishing the purposes of the Act. If the standard is met, then no further conditions are necessary to accomplish the purposes of the Act. In practical terms, if Dean is providing BDT before mixing the waste water stream with the cooling stream, there is no reason to change the sampling point to only the waste stream. Such a change could accomplish nothing since the standard has already been met. The Board's action could then be characterized as arbitrary and unreasonable. In summary, whichever definition of the burden is utilized, Dean's or the Board's, Dean can carry its burden by proving its treatment system provides BDT prior to mixing.

Dean's final contention is that the Agency is estopped from requiring a change in the Chemung facility's sampling point because Dean relied to its detriment on the earlier authorization. We disagree.

■■ ■ Principles of estoppel do not usually apply to public bodies (*Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, 447, 220

N.E.2d 415), and estoppel is found against such bodies only in rare and unusual circumstances. (*County of Cook v. Patka* (1980), 85 Ill. App. 3d 5, 12, 405 N.E.2d 1376.) Before estoppel may be used against a public body it must be shown that an affirmative legislative act induced substantial reliance. (*Village of Orland Park v. First Federal Savings & Loan Association* (1985), 135 Ill. App. 3d 520, 528, 481 N.E.2d 946; *Wachta v. Pollution Control Board* (1972), 8 Ill. App. 3d 436, 289 N.E.2d 484.) The party claiming estoppel must have relied upon the acts of the other and have had no way of knowing the true facts. *Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, 447, 220 N.E.2d 415.

■■ In the case now before the court, Dean asserts that it expended over $256,000 to make improvements to its treatment system in reliance on the Agency's designation of a post-mixture sampling point. The testimony at the hearing does not support this assertion. The statement of John Hetrick, who served as Director of Environmental Control for Dean from 1974 to 1981, described numerous changes that were made at the Chemung facility between 1974 and 1978 "to increase its efficiency." Hetrick's statement also discussed additional alterations that were made during the same time period "in order to comply by August, 1976 with effluent requirements in the NPDES permit." Nowhere in the testimony is there even a suggestion that the changes were made by Dean in reliance on the sampling point allowed by its NPDES permit. The changes were made for efficiency and to meet permit effluent requirements. Dean's witnesses did not show any connection between the special sampling point and the changes made in the facility. Nor did they show that the changes would not have been made, or would have been done differently, if a different sampling point had been required. Dean has failed to show that it relied to its detriment on an Agency action. Absent such reliance, estoppel should be given no effect against the Agency.

■■ A more compelling reason for not applying the doctrine of estoppel here, however, is that what is involved is the protection of the environment and the people who inhabit it. An estoppel may not be invoked where it would operate to defeat the effectiveness of a policy adopted to protect the public. (*Tri-County Landfill Co. v. Pollution Control Board* (1976), 41 Ill. App. 3d 249, 255, 353 N.E.2d 316.) Progress in controlling pollution should not be barred by methods of the past. Estoppel must not be allowed to prevent the adoption and application of new techniques or more effective controls merely because less efficient ones were approved in the past. (41 Ill. App. 3d 249, 256, 353 N.E.2d 316.) This is especially so in the absence of any

rare and unusual circumstances. Dean has not shown such circumstances.

For the foregoing reasons, we reverse that portion of the order of the PCB which affirmed the sampling point condition placed on Dean's NPDES permit No. IL0003395 by the EPA, and remand with directions that the PCB hold a *de novo* hearing solely to consider the relevant evidence presented by Dean in order to determine whether Dean is providing BDT at its Chemung waste water treatment plant. We affirm that portion of the PCB order which pertains to the issue of estoppel.

Affirmed in part; reversed in part; and remanded.

NASH, P.J., and LINDBERG, J., concur.