THE VILLAGE OF FOX RIVER GROVE, Petitioner, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Second District   No. 2—98—0058

Opinion filed November 5, 1998.

Peter M. Rosenthal, Simone M. Boutet, and Maureen P. Higgins, all of Rosenthal, Murphey, Coblentz & Janega, of Chicago, for petitioner.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Erik G. Light, Assistant Attorney General, of counsel), and Margaret Pasowicz Howard, of Illinois EPA, of Springfield, for respondents.

JUSTICE RATHJE delivered the opinion of the court:

The petitioner, the Village of Fox River Grove (Village), appeals from a decision of the Illinois Pollution Control Board (IPCB) refusing to eliminate certain restrictions attached to the National Pollution Discharge Elimination System (NPDES) permit issued to the Village

by the Illinois Environmental Protection Agency (IEPA) for the wastewater treatment facility (the facility) owned and operated by the Village. We affirm the order of the IPCB.

On appeal, the Village has identified seven separate issues for our consideration. For clarity purposes, we restate the issues raised as follows: (1) whether the standard of review applicable in this case is *de novo*; (2) whether the IPCB erred in utilizing the facility's hydraulic flow rating to arrive at population equivalents for purposes of determining whether stricter effluent limits under IPCB regulations applied; (3) whether the IPCB erred in refusing to consider the prior interpretations of the applicable regulations by the IEPA; and (4) whether the imposition of the stricter effluent limits will inhibit the ability of the facility to treat sewage within the facility's designated service area.

In order to understand fully the issues raised on this appeal, it is necessary to review the NPDES permit history of the Village's treatment facility, as well as the history of the facility itself.

The original treatment facility was built in 1926; it was last upgraded in 1978. The facility is located in a residential area. Construction of a new facility on the site is not possible since under current regulations the entire site is in a flood plain. The sewer system, which is a tributary to the facility and which was constructed in 1926-27, allows for more than the normal amount of infiltration of storm water and groundwater flow. When the facility was redesigned in 1977, it was determined that it would be easier to treat the infiltration rather than to try to remove it from the facility. The wastewater flow rates for the facility were based on a combination of sewage and infiltration. Thus, while the facility was designed for and is rated as having a hydraulic or design flow capacity of 1.25 million gallons per day, the facility was designed to treat only 1 million gallons of sewage per day.

Before turning to the history of facility's NPDES permits, it is necessary to understand the term "population equivalent" as defined in the regulations of the IPCB. "Population equivalent" (P.E.) is defined as follows:

"a term used to evaluate the impact of industrial or other waste on a treatment works or stream. One population equivalent is 100 gallons (380 liters) of sewage per day, containing 0.17 pounds (77 grams) of BOD (5) (five day biochemical oxygen demand) and 0.20 pounds (91 grams) of suspended solids. The impact on a treatment works is evaluated as the equivalent of the highest of the three parameters. Impact on a stream is the higher of the BOD (5) and

suspended solids parameters." 35 Ill. Adm. Code § 301.345 (eff. May 28, 1981).

Based upon the 1976 planning report done for the redesign of the facility, the population equivalent was shown to be a residential population at 8,500 equivalents and Good Shepard Hospital at 1,500 equivalents for a total of 10,000 P.E.

An NPDES permit is a permit that allows water from the facility to be discharged into the Fox River. The NPDES permit contains limits on the amount of deoxygenating or organic waste that can be contained in the water that flows from the facility into the Fox River. These limits are expressed in terms of suspended solids and either five-day carbonaceous biochemical oxygen demand (CBOD5) or five-day biochemical oxygen demand (BOD5). For example, 30 milligrams per liter (mg/l) of BOD5 is the equivalent of 25 mg/l of CBOD5.

The first NPDES permit for the facility was issued in 1977 by the United States Environmental Protection Agency (USEPA) and provided for effluent limitations of 30 mg/l for BOD5 and 30 mg/l for suspended solids. In 1986, the Village received a proposed NPDES permit for the facility that lowered the effluent concentrations from 30 mg/l of BOD5 to 20 mg/l and from 30 mg/l of suspended solids to 25 mg/l. In a letter dated November 3, 1986, to the IEPA, which administered the issuance of the permits for the USEPA, the Village stated its position as follows:

> "We believe your changing of our monthly average effluent limits for BOD and SS (suspended solids) from 30/30 mg/l to 20/25 mg/l is an incorrect interpretation of the Illinois Pollution Control Board Rules and Regulations Subtitle C, Chapter I, Section 304.120b. This section requires that no effluent from any source whose untreated waste load is 10,000 population equivalents *or more* (emphasis in original), shall exceed 20 mg/l of BOD5 and 25 mg/l of suspended solids. Our plant design capacity is for untreated wastes [*sic*] loads up to 10,000 population equivalents. Our present untreated waste load is less than 10,000 population equivalent. Therefore, we believe we correctly come under Section 304.120a which requires an effluent limit of 30/30 mg/l of BOD/SS."

In a letter dated December 5, 1986, the IEPA responded as follows:

> "The basic premise of Section 304.120 of the Illinois Environmental Protection Act, Subtitle C, Chapter I is to establish effluent Standards based on the design average flow of the facility. ***
>
> A literal interpretation of 304.120(b) would establish effluent standards that could vary from month to month, week to week, or day to day depending on the influent characteristics of the waste at

any one point in time. The Agency does not agree with this interpretation."

The Village appealed the IEPA's decision to the IPCB but withdrew its appeal when a settlement was reached with the IEPA. Under the settlement, the facility was rerated from a 10,000 P.E. to a design organic equivalent of 9,900 P.E. An NPDES permit for the facility was issued providing effluent limitations of 30 mg/l for BOD5 and 30 mg/l for suspended solids. In 1992, the facility's NPDES permit was renewed and provided effluent limits of 25 mg/l CBOD5 and 30 mg/l for suspended solids. At the time of the 1992 renewal, the USEPA reviewed the facility's NPDES permit and indicated no problems with the above-stated limits.

The Village sought renewal of the facility's NPDES permit in 1996. In a November 8, 1996, letter to the Village, the IEPA issued a draft permit providing for effluent limits of 20 mg/l of CBOD5 and 25 mg/l of suspended solids. After the Village questioned the imposition of the more stringent effluent limits, on February 6, 1997, the IEPA responded by letter as follows:

"Please refer to the definition of 'Population Equivalent' as outlined in Section 301.345 of Title 35, Subtitle C, Chapter I: 'One population equivalent is 100 gallons of sewage per day, containing 0.17 pounds of BOD5 and 0.20 pounds of suspended solids. The impact on a treatment works is evaluated as the equivalent of the highest of the three parameters.' Although the facility has been rerated for a 9,900 P.E. organic rating, it is hydraulically rated at 12,500 P.E. For this reason, the Agency must rate the plant at 1.25 mgd and the associated 20mg/l CBOD5 limit and 25 mg/l suspended solids limit must be incorporated pursuant to Section 304.120(b) of Subtitle C. The facility was designed for a 10,000 P.E. organic loadings and 20/25 BOD5/SS effluent limitations and should be capable of meeting these limitations. Obligations and plans made to include additional unsewered areas and new developments will obviously increase suspended solid and organic loads on the plant, however, the Agency believes that the plant, as designed, will meet the limitations set in the permit until the above design capacities of the plant are reached. Under the present operating conditions and effluent quality, the Agency will be able to issue permits for additional wasteloads [sic] tributary to the treatment plant. Upgrades to the facility may be required if the facility approaches its design capacity. However, the effluent limits in the enclosed permit will not affect the need for future upgrades."

The Village appealed the NPDES permit conditions to the IPCB, and a hearing was held on September 17, 1997.

Daniel Hughes, the superintendent of water and sewer for the Village, testified and explained how the facility operated. He noted that, due to the use of biological contractors in the water treatment process, the process is less effective during the winter because the cold slows down the metabolism of the microorganisms used in the process. He further explained that hydraulic capacity of the facility was 1.25 mgd, which means that the facility is designed for an average flow of 1.25 million gallons of wastewater per day. The 9,900 P.E. rating is the organic loadings and refers to the CBOD and suspended solids loadings. According to Mr. Hughes, the facility has never come close to its 9,900 P.E. rating. The Village has also entered into an agreement with the Lake Barrington Industrial Park to provide wastewater treatment for approximately 98 new units. There has been no notice from the IEPA changing the 9,900 P.E. rating.

On cross-examination, Mr. Hughes was shown a discharge monitoring report for the facility. After reviewing the report, he agreed that the limits reported were well below the more stringent limitations the IEPA was now requiring, even for the colder months. On redirect examination, he explained that the fact the suspended solids and the CBODs went up between April and May reflected that the trend towards less efficiency begins during the winter; peak operating efficiency is not met until the microorganisms have warmed up enough to become more active.

S. Allen Keller, manager of the northern municipal unit in the permit section of the water pollution control division of the IEPA, testified as an adverse witness. He had not been involved with any of the prior NPDES permits issued to the Village. He acknowledged that effluent limits in the draft 1997 NPDES permit are based upon the same design average flow of 1.25 and organic limitation rating of 9,900 P.E. applicable when the 1987 and 1992 permits were issued. He further acknowledged that the USEPA raised no problems with regard to the renewal of the NPDES permit in 1992.

Mr. Keller further testified that the effluent limitations in the 1997 permit were based upon section 304.120(b) of the Environmental Protection Act (the Act) (35 Ill. Adm. Code § 304.120(b) (eff. May 4, 1989)). However, he admitted that section 304.120(b) does not refer to waste load "capacity." He explained that the IEPA does not read section 304.120(b) literally but utilizes actual design permitting capacities even though that wording is not used in the regulation. Mr. Keller also agreed that the NPDES permit is one that allows discharge into a stream.

Mr. Keller further testified that there have been no pertinent

changes to either section 301.345 of the Act (35 Ill. Adm. Code § 301.345 (eff. May 28, 1981)) or section 304.120(b) since 1977. While the IEPA did not issue permits that violated the regulations, Mr. Keller took the position that an error had been made with regard to the issuance of the 1987 and 1992 NPDES permits in this case.

Lawrence Thomas testified that he is vice-president of Baxter & Woodman, a civil engineering firm that provides engineering services for the Village. He was involved with the issuance of both the 1987 and 1992 NPDES permits. He explained that in 1987, when the Village objected to the effluent limits proposed by the IEPA, the IEPA agreed that the way to solve the problem was to rerate the facility to 9,900 P.E. so that the Village would be in compliance with the regulations. When the draft 1997 permit was issued with the lower effluent limits, he discussed the situation with Don Netemeyer, a staffer with the IEPA, and provided him with materials concerning the issuance of the 1987 NPDES permit. He agreed with the IEPA's statement that upgrades to the facility may be required as the facility approaches its design capacity. However, there have been no hazardous conditions caused by the operation of the facility.

Mr. Thomas further testified that the Village's concern over the lower effluent limits was due to the fact that the load on the facility is expected to grow, decreasing the efficiency of the facility, and may result in a situation where the lower effluent levels will be exceeded. The Village would then have to stop extending service in the facility planning area. If the Village is in violation, a compliance program would be very expensive.

On cross-examination, Mr. Thomas testified that at the present time the facility is not violating the lower effluent limits. He acknowledged that the risk of the violation comes from increased loading conditions at the facility, not what the IEPA is doing. Mr. Thomas explained that in the original design of the facility there was both a hydraulic component and a suspended solids/BOD component to the P.E. loading and that the hydraulic component was also identified as 10,000 P.E. The additional flow was clear water from infiltration.

S. Allen Keller, testifying on behalf of the IEPA, explained that, in reviewing the request for the 1997 NPDES permit for the facility, Don Netemeyer brought to his attention a discrepancy between the effluent limits for the Village's facility and those imposed on other facilities having a 10,000 P.E. or more. Under section 301.345, the impact on treatment works is evaluated as the equivalent of the highest of three parameters—the flow, the BOD, and the TSS (suspended solids). The flow of 1.25 million gallons per day was determined to be the

highest parameter and equates to 12,500 hydraulic P.E. Since the facility's hydraulic flow exceeds 10,000 P.E., the effluent limits in section 304.120(b) are applicable. However, Mr. Keller acknowledged that the higher effluent limits would not be applicable if the facility's organic P.E. of 9,900 was used.

Mr. Keller further testified that the facility has room at the present time to receive additional waste load. However, if in the future the Village had problems meeting the effluent standards, it would have to consider, amongst other things, expanding or upgrading the facility. He maintained that the fact that the IEPA issued the NPDES permits in the past for the facility was due to its failure to read the definitions closely with respect to the hydraulic P.E.

On cross-examination, Mr. Keller testified that the IEPA misinterpreted the regulations in 1987 when it agreed to reduce the facility's rating to 9,900 P.E. by strictly looking at the organic P.E. The IEPA did not determine how much of the 1.25 million gallons per day was based on infiltration and inflow. After the IEPA had issued the new effluent limits, it received the information from Mr. Thomas regarding the breakdown between the amount of sewage and the amount of infiltration in the flow. Mr. Keller acknowledged that section 304.120(b) used the word "waste," not "hydraulic load." He agreed that the NPDES permit placed a limit on the impact that the effluent can have on the Fox River.

On redirect examination, Mr. Keller testified that the design average flow, which would include the infiltration, is one of the three factors used to determine what the BOD and suspended solids levels should be. The reason that the impact on the treatment works is considered is that section 304.120(b) specifically states that it is the untreated waste load that must be examined. On re-cross-examination, Mr. Keller admitted that inflow and infiltration are not waste by themselves but asserted that they affected the design of the facility. He defined hydraulic loading as the amount of flow received at a treatment facility and treated; in this case, it is also the BOD influent to the treatment plant that has to be treated.

In its opinion denying the Village's NPDES permit appeal, the IPCB identified the dispute between the parties as "whether the hydraulic design flow or organic loading should be used to determine population equivalents." The IPCB stated further as follows:

> "The plain language of Section 304.120(b) prohibits discharges which exceed 20 mg/L of BOD5 and 25 mg/L of suspended solids from any source whose 'untreated waste load is 10,000 population equivalents or more.' The reference to 'untreated waste load'

unmistakably refers to the load received by the treatment facility. Thus, the regulation directs the reader to determine population equivalents based on the impact to the treatment works.

Section 301.345 defines population equivalent using the gallons of sewage per day containing specific levels of BOD5 and suspended solids. Section 301.345 provides that the impact on a treatment works is to be evaluated based on the higher [sic] of the three parameters. The hydraulic flow for the Village's plant is 1.25 mgd, which is divided by 100 gallons per day to yield 12,500 population equivalents pursuant to Section 301.345. Therefore, the population equivalent, based on the plain reading of the regulation can be no less than 12,500, because Section 301.345 specifies that population equivalent is the higher [sic] value of the three parameters. With population equivalents of 12,500, the effluent cannot exceed 20 mg/L of BOD5 and 25 mg/L of suspended solids pursuant to Section 304.120(b).

As stated above, the Board in reviewing a permit appeal looks to whether the applicant proves that the application, as submitted to the Agency, demonstrated that no violations of the Act or Board regulations would have occurred if the requested permit had been issued. Clearly, issuing a permit with effluent limitation higher than 20 mg/L of BOD5 and 25 mg/L of suspended solids would violate the provisions of Section 304.120(b). Therefore, the Board finds that the permit application as requested by the Village could not issue and the Agency properly imposed the limitations set forth in Section 304.120(b).''

The Village now brings this appeal from the order of the IPCB.

We first must determine the standard of review applicable to this case. The Village asserts that, as the material facts are not in dispute in this case and the case turns on the interpretation of a regulation, a question of law is presented for which *de novo* review by this court is required. On the other hand, the IPCB argues that its interpretation of its own regulation is entitled to deference by this court.

■ While an administrative agency's findings of fact should not be disturbed unless they are against the manifest weight of the evidence, the rule does not apply where the question involved is one of law, such as the proper interpretation of a statute. In such cases, the governing board's finding is not binding on the court. *Envirite Corp. v. Illinois Environmental Protection Agency*, 158 Ill. 2d 210, 214 (1994). However, an administrative agency's own interpretation of one of its own rules should be given substantial weight by the reviewing court unless it is plainly erroneous or inconsistent with past interpretations. *Dean Foods Co. v. Illinois Pollution Control Board*, 143 Ill. App. 3d 322, 334

(1986). Where a regulation is clear on its face, the court must give effect to the language in the provision. *Dean Foods Co.*, 143 Ill. App. 3d at 334. Courts will also give substantial weight and deference to the interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute based upon the fact that the agencies can make informed judgments upon the issues, based upon their experience and expertise. *Cojeunaze Nursing Center v. Lumpkin*, 260 Ill. App. 3d 1024, 1029 (1994).

We agree with the Village in this case that the IEPA's interpretation of the regulations in this case is not entitled to deference. Neither the facility nor the applicable regulations changed since the issuance of the 1987 permit. Under the IEPA's interpretation of the IPCB's regulations in 1987, the effluent limits problem was resolved by rerating the facility's organic P.E. to 9,900. That rating also has not changed. Therefore, the effluent limitations imposed in the draft 1997 NPDES permit are inconsistent with the prior interpretation by the IEPA. Moreover, the IEPA suggests in this case that its interpretation of the IPCB regulations applicable in this case was incorrect. Therefore, the IEPA's past interpretation of the applicable regulations is not entitled to deference.

■ However, what is before us is the IPCB's interpretation of its own regulations. The IPCB has never previously interpreted section 304.120(b) in the context of the issue raised before it. In its opinion in this matter, the IPCB was asked to decide between two different interpretations of section 304.120(b), neither of which it had previously endorsed. Therefore, as concerns the IPCB, there is no question of inconsistency with a prior interpretation, nor, as we shall explain below, do we find the IPCB's interpretation of its regulation to be plainly erroneous. In contrast, in *Dean Foods Co.*, the IPCB's interpretation was found to be inconsistent with its own prior interpretation of the "Dilution Rule" as well as with the past interpretation of that rule by the IEPA. *Dean Foods Co.*, 143 Ill. App. 3d at.330. We will therefore give substantial weight to the IPCB's interpretation of section 304.120(b). See *Dean Foods Co.*, 143 Ill. App. 3d at 334.

The Village contends, first, that section 304.120(b) does not require that stricter effluent limits be included in the 1997 NPDES permit than were contained in the prior permits. Section 304.120(b) provides in pertinent part as follows:

> "No effluent from any source whose untreated waste load is 10,000 population equivalents or more *** shall exceed 20 mg/l of BOD5 or 25 mg/l of suspended solids." 35 Ill. Adm. Code § 304.120(b) (eff. May 4, 1989).

The Village argues that the term "untreated waste load" as used in the above section means the amount of wastewater a treatment facility is designed to handle, not the amount of water flow the plant is designed to handle. Therefore, the Village asserts that the IPCB erred in concluding that the hydraulic capacity of the facility instead of the organic loading should be used to determine the facility's untreated waste load. We disagree.

■ Under section 304.120(b), if the facility's untreated waste load is 10,000 or more P.E., the stricter effluent limits apply. In this case, the facility has two ratings, 9,900 organic P.E. and 12,500 hydraulic P.E. In order to determine which P.E. rating should be used for purposes of section 304.120(b), we turn to section 301.345. Under that section, it first must be determined if it is the impact on the stream or the treatment facility that is to be measured. The Village argues that since an NPDES permit is at issue it is the impact on the stream that is to be measured. However, that interpretation would render the language in the regulation regarding the impact on the treatment facility meaningless since all NPDES permits are issued in connection with the discharge of water into a stream or other body of water. In this case, the waste flows into the treatment facility, not directly into the Fox River. Therefore, we agree with the IPCB that it is the impact on the facility that must be measured in this case.

Section 301.345 then provides that the impact on the facility is evaluated by the highest of the three specified parameters: the flow of sewage, the BOD5, and the suspended solids. The highest parameter is the flow of sewage at 100 gallons per day. The facility in this case is designed to process 1.25 million gallons per day. Therefore, the impact would be measured at 12,500 P.E., which would then require the facility to adhere to the stricter standard set forth in section 304.120(b).

Nevertheless, the Village argues that the flow into the treatment plant is actually made up of sewage on the one hand and a combination of storm water and groundwater on the other. Therefore, since section 301.345 refers to "flow of sewage," the Village reasons that it is the organic rating that should be utilized rather than the hydraulic rating, which takes into account all of the water flowing into the facility from whatever source. However, as a practical matter, once the sewage becomes mixed with the groundwater and storm water, the resulting product is all sewage. Therefore, the IPCB correctly determined that it is the facility's hydraulic rating that should be used in determining the P.E. for purposes of section 304.120(b).

It is apparent from the history of the issuance of the NPDES permits for this facility that beginning with the 1987 NPDES permit

the IEPA incorrectly determined the effluent limits applicable to this facility based upon the facility's organic rating. While not raised here, we note that the original organic rating for the facility was 10,000 P.E., which would have qualified it for the stricter effluent limits of section 304.120(b) even if the organic rating had been used. The 1987 "rerating" of the facility to 9,900 P.E. appears to have been a compromise between the Village and the IEPA to settle the dispute between them rather than the result of any physical changes to the facility or in the treatment process that would have prompted a change in the organic P.E. rating. The IPCB played no role in that "compromise."

In any event, the IEPA then corrected its error when it issued the 1997 permit. Asked to address this question for the first time, the IPCB agreed with the IEPA's interpretation that the hydraulic flow should be used to determine the P.E. for purposes of section 304.120(b). Even where two readings of an ambiguous provision of an administrative regulation are reasonable, the governing board's choice must be respected. *Environmental Protection Agency v. Pollution Control Board*, 86 Ill. 2d 390, 403 (1981). We conclude that the IPCB's interpretation of its regulations is a reasonable one and based on the regulation itself.

■ Finally, the Village submits that even the IPCB acknowledges that if section 304.120(b) is given its plain, commonly understood meaning, the more stringent effluent limits would not apply to this facility because there is no evidence that the untreated waste load of the facility has ever actually been 10,000 P.E. or more. The IPCB responds that such a "literal" reading of section 304.120(b) would result in effluent levels varying from month to month or even from day to day.

An administrative agency has the power to construe its own rules and regulations to avoid absurd or unfair results. *Modine Manufacturing Co. v. Pollution Control Board*, 40 Ill. App. 3d 498, 502 (1976). In this case, it is more likely that there will be more frequent fluctuations in the amount of actual sewage flowing into the facility rather than in the total amount of water, since the facility is designed to process only 1.25 million gallons of water per day. Therefore, it was more reasonable for the IPCB to construe the regulation as requiring the use of the hydraulic rather than the organic rating. Moreover, we disagree with the Village that the word "capacity" must be read into section 304.120(b) to support the IPCB's interpretation of that regulation. We agree with the IPCB that "untreated waste load" refers "unmistakably" to the load received by the facility. Such an interpretation is reasonable given the fact that once the sewage and groundwa-

ter and storm water are mixed together the resulting product is all sewage or waste.

We conclude, therefore, that the IPCB correctly determined that the facility's hydraulic flow rather than its organic loading should be used to determine the population equivalents for purposes of determining the applicability of the stricter effluent limits set forth in section 304.120(b).

The order of the IPCB is affirmed.

Affirmed.

INGLIS and THOMAS, JJ., concur.