2018 IL App (4th) 170144

NO. 4-17-0144

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 29, 2018
Carla Bender
4th District Appellate
Court, IL

| THE ILLINOIS ENVIORNMENTAL | ) | Direct Review of the Illinois |
| PROTECTION AGENCY, | ) | Pollution Control Board |
| Petitioner, | ) | PCB No. 16-66 |
| v. | ) | |
| THE ILLINOIS POLLUTION CONTROL | ) | |
| BOARD and BRICKYARD DISPOSAL | ) | |
| & RECYCLING, INC., | ) | |
| Respondents. | ) | |

JUSTICE KNECHT delivered the judgment of the court, with opinion
Presiding Justice Harris and Justice Steigmann concurred in the judgment and
opinion.

**OPINION**

¶ 1        Respondent, Brickyard Disposal & Recycling, Inc. (Brickyard), filed a permit

application with petitioner, the Illinois Environmental Protection Agency (Agency), seeking to

modify the design of its Vermilion County landfill to allow a "wedge" area to be filled with

municipal solid waste as opposed to inert material. The Agency denied the petition as

incomplete, finding Brickyard failed to obtain local governmental approval for the proposed

expansion under section 39(c) of the Environmental Protection Act (Act) (415 ILCS 5/39(c)

(West 2014)) and failed to include a new or updated groundwater impact assessment (GIA).

¶ 2        Brickyard appealed the Agency's decision to the Illinois Pollution Control Board

(Board). Before the Board, both parties filed summary judgment motions. The Board granted

Brickyard's motions, finding local governmental approval was not required as Brickyard was not seeking to expand the boundaries of its pollution control facility and determining Brickyard's GIA was not incomplete. The Board ordered the Agency to consider the technical merits of Brickyard's application.

¶ 3 The Agency petitioned this court for direct administrative review, arguing the Board erroneously found Brickyard's request to fill the wedge area is not a request for a "new pollution control facility" that requires local siting review. We affirm.

¶ 4 I. BACKGROUND

¶ 5 Brickyard owns and operates a landfill in Vermilion County, Illinois. In June 1981, the Agency issued to Brickyard a development permit for construction of a landfill facility. The Agency authorized the development of a 293-acre site with waste disposal occurring on 152 acres under a single landform with a height not to exceed 675 feet.

¶ 6 At the time Brickyard acquired its development permit, the Agency had the task of approving the site of pollution control facilities. As of November 1981, the Act was amended to provide for the siting review of "new pollution control facilities" to be performed by local governmental authorities. See Pub. Act 82-682, § 1 (eff. Nov. 12, 1981) (amending 415 ILCS 5/39).

¶ 7 In April 1987, the Agency issued a supplemental permit to divide the landfill into two units. Unit 1 consisted of the southern portion of the facility. Unit 2 constituted the northern portion. The permit affirmed the final elevation contours and the waste boundaries set forth in the June 1981 development permit.

¶ 8 In September 1991, Brickyard filed a "Request for Site Approval for a Regional

Pollution Control Facility" with the Vermilion County Board. Brickyard sought local siting approval for "the volumetric expansion of the existing landfill." In the public notice of the request, Brickyard stated it was seeking an expansion consisting of a lateral expansion of approximately 21 acres and a 40-foot vertical expansion in height "over a 90-acre portion of the total 293-acre facility." The drawings included a profile of the proposed vertical expansion that depicted an expansion across a single landform to a height of 715 feet.

¶ 9        In February 1992, the Vermilion County Board approved Brickyard's request for an expansion of the vertical and lateral boundaries. The county board approved "a lateral and vertical expansion of permitted landfill boundaries, within existing property boundaries." In October 1992, the Agency issued a supplemental permit, approving the "revised final contours within the approval granted by the Vermilion County Board" and final contours for unit 1 consistent with a drawing submitted with the permit application.

¶ 10       In May 1995, the Agency issued a permit for units 1 and 2 of the facility. The stipulated facts present show a condition of the permit was that a "separate berm shall be maintained between Unit I and Unit II which will allow independent groundwater monitoring." The parties refer to this berm as the "wedge."

¶ 11       On August 31, 2015, Brickyard filed a permit application, seeking to modify the permit to allow disposal of municipal waste in the wedge between unit 1 and unit 2. Brickyard made the following statement in its application:

> "The total waste volume of the Brickyard Disposal and
> Recycling Landfill will be increased by approximately 1,010,000
> yd.[3] thereby providing a total Unit 2 waste volume of 15,210,000

yd.$^3$ fill capacity as opposed to the currently permitted 14,200,000

yd.$^3$ capacity. The documented estimated remaining life

expectancy of Brickyard Disposal and Recycling Landfill is 16

years per the January 1, 2015[,] Annual Landfill Capacity

Certification. With the addition of 1,010,000 yd. 3 of waste

capacity in the 'Zone A' Fill Area the life expectancy of the

landfill increases to approximately 21 years."

¶ 12    The Agency, by a letter later dated September 24, 2015, informed Brickyard its application was incomplete due to lack of local siting approval under section 39(c) of the Act (415 ILCS 5/39(c) (West 2014)) and the absence of a new GIA.

¶ 13    On October 30, 2015, Brickyard responded to the Agency's letter by submitting a supplemental application. In November 2015, the Agency concluded Brickyard had not corrected the errors of its initial filing and issued a final incompleteness determination. The Agency did not consider the technical merits of the permit application. Brickyard appealed to the Board.

¶ 14    Brickyard filed a timely petition to the Board, seeking review of the Agency's permit determination. The Agency moved for summary judgment on its determination that Brickyard, by law, was required to provide local siting approval for its proposed expansion. Brickyard filed two motions for summary judgment, arguing its application was complete, as local siting approval was not required. Brickyard disputed the Agency's finding that it was creating a new pollution control facility, arguing it was not seeking an expansion beyond the boundaries of its current facility. Brickyard further maintained it need not provide a new GIA.

¶ 15    The Board issued its opinion and order in November 2016. The Board granted

summary judgment to Brickyard on both grounds, finding the proposal to fill the wedge area with waste does not require new local siting approval as it is not a "new pollution control facility." The Board concluded "a waste-free wedge was never required by the County" and the county "would have had no reason to expect anything but waste to be in what only later the Agency would delineate as a non-waste wedge." The Board further found Brickyard's GIA complete. The Board directed the Agency to perform a technical review of Brickyard's permit application.

¶ 16        On the Agency's motion for reconsideration, the Board affirmed its holding. The Board further observed the following: "Taking the Agency's argument to its conclusion, the Agency would have the County consider whether to approve siting for waste disposal in the middle of an existing landfill under a 40-foot waste layer it already approved in 1992. This cannot be what the General Assembly intended." The Board denied the motion to reconsider.

¶ 17        The Agency seeks direct review of the Board's decision.

¶ 18                            II. ANALYSIS

¶ 19                            A. Standard of Review

¶ 20        This appeal arises from an order of summary judgment on Brickyard's behalf. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Orr v. Fourth Episcopal District African Methodist Episcopal Church*, 2018 IL App (4th) 170469, ¶ 60, ___ N.E.3d ___. We review orders of summary judgment *de novo*. *Id.* ¶ 61.

¶ 21        The question underlying the motion of summary judgment is a matter of statutory construction. Matters of statutory interpretation are questions of law, which we review *de novo*.

*Farris v. Industrial Comm'n*, 357 Ill. App. 3d 525, 527-28, 829 N.E.2d 372, 374 (2005). In cases presenting questions of law arising from a decision by the Board, the Board's findings are not binding on the appellate court. *Village of Fox River Grove v. Pollution Control Board*, 299 Ill. App. 3d 869, 877, 702 N.E.2d 656, 662 (1998).

¶ 22                                    B. Applicable Law

¶ 23        The purpose of the Act is "to establish a unified, state-wide program supplemented by private remedies, to restore, protect[,] and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them." 415 ILCS 5/2(b) (West 2014). The Act authorizes the establishment of the Agency. *Id.* § 4(a). Among the roles of the Agency is its task to issue permits to applicants upon proof the "facility *** will not cause a violation of this Act or of regulations hereunder." *Id.* § 39(a). The Act further authorizes the Agency to impose conditions that are necessary to accomplish the purposes of the Act. *Id.*

¶ 24        Before November 1981, the Agency was generally entrusted with approving permits for the development of landfill facilities. *M.I.G. Investments, Inc. v. Environmental Protection Agency*, 122 Ill. 2d 392, 398, 523 N.E.2d 1, 3 (1988). As of November 1981, however, the Act was amended to provide "county and municipal governments a limited degree of control over new solid waste disposal sites within their boundaries." *Id.* (citing Pub. Act 82-682 (eff. Nov. 12, 1981)). Local authorities were so authorized to avoid placing "a regional authority (the Agency) in a position to impose its approval of a landfill site on an objecting local authority." (Internal quotation marks omitted.) *Id.* (quoting *E&E Hauling, Inc. v. Pollution Control Board*, 107 Ill. 2d 33, 42, 481 N.E.2d 664, 668 (1985)).

¶ 25       Under the amended statute, local county boards "shall approve or disapprove the request for local siting approval" upon consideration of statutory criteria. 415 ILCS 5/39.2(a) (West 2014). If the proposed facility establishes the statutory criteria, "local siting approval shall be granted." *Id.* The enumerated criteria include "the facility is necessary to accommodate the waste needs of the area it is intended to serve" (*id.* § 39.2(a)(i)); "the facility is located so as to minimize incompatibility with the character of the surrounding area" (*id.* § 39.2(a)(iii)); and "the plan of operations for the facility is designed to minimize the danger to the surrounding area from fire, spills, or other operational accidents" (*id.* § 39.2(a)(v)).

¶ 26       Local siting approval is not required for all permits. Local governmental authority is required, however, for the development or construction of "a new pollution control facility." *Id.* § 39(c). Section 39(c) mandates:

> "[N]o permit for the development or construction of a new
> pollution control facility may be granted by the Agency unless the
> applicant submits proof to the Agency that the location of the
> facility has been approved by the County Board of the county if in
> an unincorporated area[ ] in which the facility is to be located in
> accordance with Section 39.2 of this Act." *Id.*

¶ 27       A "new pollution control facility" includes existing facilities that seek to alter their boundaries and facilities that seek to introduce special or hazardous waste:

> "(b) A new pollution control facility is:
>
> (1) a pollution control facility initially permitted for
> development or construction after July 1, 1981; or

- 7 -

（2) the area of expansion beyond the boundary of a currently permitted pollution control facility; or

(3) a permitted pollution control facility requesting approval to store, dispose of, transfer or incinerate, for the first time, any special or hazardous waste." *Id.* § 3.330(b).

¶ 28         The dispute in this case centers on the meaning of the language in subsection (b)(2) of the "expansion beyond the boundary of a currently permitted pollution control facility" (*id.* § 3.330(b)(2)). The Agency maintains Brickyard's permit application falls squarely within this definition, and therefore, local siting approval is required. Brickyard disputes this interpretation, asserting the request to expand into the wedge is an expansion within the boundaries of its facility.

¶ 29                         C. The Meaning of Section 3.330(b)(2)

¶ 30         Our fundamental task in construing a statute is to ascertain and give effect to the intent of the legislature. *M.I.G. Investments*, 122 Ill. 2d at 397. In performing this task, we should consider the statute's language as well as the reason for the law, the evils to be remedied, and the purposes to be obtained. *Id.* at 397-98. We read the statute as a whole and consider all relevant parts, giving, if possible, each word, clause, and sentence a reasonable meaning. *Farris*, 357 Ill. App. 3d at 528. When the statutory language is clear and unambiguous, "it will be given effect without resort to other tools of construction." *Segers v. Industrial Comm'n*, 191 Ill. 2d 421, 431, 732 N.E.2d 488, 494 (2000).

¶ 31         The Agency contends because section 3.330(b)(2) refers to a "currently permitted" facility boundary, the proposed design change must be evaluated to determine

whether it expands "beyond the *currently permitted waste boundaries* as set by the Agency[—]not the 'currently sited' boundaries." (Emphasis in original.) In support, the Agency relies on *M.I.G. Investments* as establishing a change to a "volumetric boundary" of waste necessitates local siting. The Agency emphasizes the change sought by Brickyard would surpass the "volumetric boundary" and increase the site's waste volume by 1 million cubic yards and proposes a "new pollution control facility" that affects the " 'scope and nature' of Brickyard's landfill, implicating local interests and triggering county review."

¶ 32    Brickyard disputes this interpretation of section 3.330(b)(2), asserting the Agency is inserting words into the statute that do not exist. Brickyard contends the "boundaries" of the "facility" is not the same as boundaries of waste collection. Brickyard further argues *M.I.G. Investments* is distinguishable as the Illinois Supreme Court in that case considered the landfill operator's argument that it need not seek local siting approval for an expansion beyond a vertical boundary and no vertical boundary expansion is requested here. Brickyard further maintains, when the Vermilion County Board provided local site approval of the vertical and lateral expansion of the facility in 1992, it had no reason to believe anything but waste would be in the area. Brickyard argues new local siting approval is not required.

¶ 33    We agree with Brickyard that the Agency's interpretation adds words into the statute. Section 3.330(b)(2) plainly applies to a request to expand "beyond the boundary of a currently permitted *pollution control facility*," not "currently permitted waste boundaries." (Emphasis added.) 415 ILCS 5/3.330(b)(2) (West 2014). The regulations establish a "pollution control facility" is more than waste-collection units. Section 810.103 of Title 35 of the Illinois Administrative Code defines "facility" as "a site and all equipment and fixtures on a site used to

treat, store[,] or dispose of solid or special wastes." 35 Ill. Adm. Code 810.103 (2005). The Code continues:

> "A facility consists of an entire solid or special waste treatment, storage, or disposal operations. All structures used in connection with or to facilitate the waste disposal operation will be considered a part of the facility. A facility may include but is not limited to, one or more solid waste disposal units, buildings, treatment systems, processing and storage operations, and monitoring stations." *Id.*

To read the plain language as the Agency suggests would be to change the clear intent of the General Assembly, which we will not do. See *Zahn v. North American Power & Gas, LLC*, 2016 IL 120526, ¶ 15, 72 N.E.3d 333 ("No rule of construction authorizes us to declare that the legislature did not mean what the plain language of the statute imports, nor may we rewrite a statute to add provisions *** the legislature did not include."). When the General Assembly said "pollution control facility," it meant the entire facility and not boundaries of "waste collection."

¶ 34          Contrary to the State's argument, *M.I.G. Investments* does not establish a "volumetric boundary" or trigger local siting review for changes in waste volume within boundaries of existing landfills. In *M.I.G. Investments*, the court considered the landfill operator's argument that it need not obtain siting approval for an expansion beyond a vertical boundary. *M.I.G. Investments*, 122 Ill. 2d at 397 ("The question we address here is *** whether it was the legislature's intent to include vertical expansions of existing 'regional pollution control facilities' within the definition of a 'new' facility ***."). The language used by the court in

*M.I.G. Investments* regarding a volumetric expansion and a change in the "scope" of the landfill were used to address the argument that local siting was not necessary to expand beyond a "vertical" boundary. *Id.* at 400-01. The court reasoned the General Assembly intended not simply lateral boundaries but also vertical boundaries, as an expansion of the vertical boundary would have an effect on the volume and change the local landscape. See *id.* at 401. It does not follow from the court's analysis that changes in volume without expanding beyond a vertical boundary triggers local siting under section 39(c).

¶ 35　　　The Agency also argues the statute's "currently permitted" language indicates the General Assembly intended the boundaries to be determined by looking at the current waste-collection permits issued by the Agency. In support of this interpretation, the Agency relies heavily on the Fifth District's decision in *Bi-State Disposal, Inc. v. Environmental Protection Agency*, 203 Ill. App. 3d 1023, 561 N.E.2d 423 (1990).

¶ 36　　　In *Bi-State Disposal*, the Fifth District considered an appeal from the Board's finding "that a proposed modification of the landfill in question constitutes a new regional pollution control facility, and that petitioner must seek local site location suitability approval." *Id.* at 1024. The previous site operator received a permit to develop the site at issue in September 1975. *Id.* An operating permit was issued in March 1978. According to the operating permit, the 40-acre site would be developed in two phases, the second of which was to include filling a mine cut that bisected the site with "nonputrescible waste." *Id.* at 1024-25. In 1982, the operating permit was transferred to the petitioner. Petitioner, at that time, proposed a modification to the facility, which eliminated the use of the mine cut. *Id.* at 1025. The Agency accordingly issued a supplemental permit. *Id.* In 1989, the petitioner sought to reopen the mine cut for use. *Id.*

¶ 37 The landfill operator in *Bi-State Disposal* argued the language of "beyond the boundary of a currently permitted" facility should be interpreted to mean a "facility for which a permit was held on July 1, 1981." (Internal quotation marks omitted.) *Id.* The Agency and the Board suggested the time to ascertain the "boundary of a currently permitted" facility is "as of the present time." (Internal quotation marks omitted.) *Id.* The Fifth District agreed the Agency and the Board's argument finding "currently" to mean the present date. *Id.* at 1027. The court then examined the permit issued by the Agency and found the boundary did not include the mine cut and local siting approval was required. *Id.* at 1027-28.

¶ 38 We reject the Agency's conclusion that the holding in *Bi-State Disposal* means this court must examine the Agency's permits regarding *waste collection* to determine the boundaries of the "currently permitted pollution control facility." Initially, we note *Bi-State Disposal* is a decision by the Appellate Court, Fifth District, that we are not bound to follow. We find the court in *Bi-State Disposal* misconstrued the significance of the term "currently permitted" to allow it to examine permits regarding waste collection that were issued after boundaries of the facility were set. While we agree the legislature intended to examine the "boundar[ies]" of the facility as a whole as they exist at the time a request for expansion is made, we find the "currently permitted" language in section 3.330(b)(2) has no hidden meaning other than to differentiate a "new pollution control facility" under section 3.330(b)(1) from a "new pollution control facility" under section 3.330(b)(2). When we interpret a statute, we are to read the statute as a whole. *Farris*, 357 Ill. App. 3d at 528. Section 3.330(b)(1) defines a "new pollution control facility" as one that has been given a developmental or construction permit and is thus not yet operating. See 415 ILCS 5/3.330(b)(1) (West 2014). Section 3.330(b)(2) is one

- 12 -

that is "currently permitted" as a "pollution control facility," meaning it is operating. *Id.* § 3.330(b)(2); see generally *M.I.G. Investments*, 122 Ill. 2d at 401 (referring to the landfill for which the operator sought an expansion of the vertical boundary as "an existing landfill facility"). The plain language shows "currently permitted" simply means the pollution control facility has advanced beyond the development stage of section 3.330(b)(1) and is operating.

¶ 39 Moreover, *Bi-State Disposal* is distinguishable on its facts. It involved siting completed before November 1981, when the Agency had the role of determining appropriate siting. No local siting had been undertaken, meaning the only source to ascertain the "boundaries" were permits issued by the Agency.

¶ 40 The Agency further contends the source for a boundaries determination should not be "local siting approval" but the boundaries should be ascertained by examining the permits it issued regarding waste collection: "local siting approval does not equal the permitted boundaries of a pollution control facility." The key flaw in this argument is the General Assembly did not use the term "permitted boundaries." Such an interpretation of section 3.330(b)(2) violates the "last antecedent" canon of statutory interpretation. According to this canon,

> "relative or qualifying words, phrases, or clauses are applied to the words or phrases or clauses immediately preceding them and are not construed as extending to or including other words, phrases, or clauses more remote, unless the intent of the legislature, as disclosed by the context and the reading of the entire statute, requires such an extension or inclusion." (Internal quotation marks omitted.) *Department of Transportation v. Singh*, 393 Ill. App. 3d 458, 465, 914

N.E.2d 511, 517 (2009) (quoting *In re E.B.*, 231 Ill. 2d 459, 467, 899 N.E.2d 218, 223 (2008)).

The statute says "boundar[ies]" of a "currently permitted pollution control facility" not "permitted boundaries." 415 ILCS 5/3.330(b)(2) (West 2014).

¶ 41　　　　We see no indication from examination of the Act that the General Assembly intended to invoke the long and expensive process of local siting review each time the Agency restricted waste boundaries and the landfill operators sought to remove or expand those waste boundaries within an existing pollution control facility. By enacting section 39(c), the General Assembly intended local governmental authorities have a say in the location of the pollution control facility and not have such a decision imposed upon them. *M.I.G. Investments*, 122 Ill. 2d at 393, 398. That the General Assembly was not concerned with internal waste boundaries when enacting the requirement for local siting approval is further evidenced by the language of section 39(c) itself. According to section 39(c), "no permit for the development or construction of a new pollution control facility may be granted by the Agency unless the applicant submits proof to the Agency that the *location of the facility* has been approved by the County Board." (Emphasis added.) 415 ILCS 5/39(c) (West 2014). There is no statutory language indicating local siting approval is necessary for the inner workings of an operating pollution control facility.

¶ 42　　　　The General Assembly, when it said a "new pollution control facility" includes "the area of expansion beyond the boundary of a currently permitted pollution control facility" (*id.* § 3.30(b)(2)), meant "the area of expansion beyond the boundary of a currently permitted pollution control facility." In this case, the boundary of the facility is ascertained from two places in the record: the Agency's siting and developmental permit of June 1981, before local siting

- 14 -

requirements were enacted, and the Vermilion County Board's 1992 siting approval. These establish the wedge is within those boundaries and thus not "area of expansion beyond the boundary." Brickyard's application does not seek a "new pollution control facility." New local siting under section 39(c) is therefore not required.

¶ 43      D. The Sufficiency of Vermilion County's 1992 Siting Approval

¶ 44      The Agency argues "Brickyard could not satisfy the Act's requirement of proof of new local siting approval for its proposed expansion with county materials from the 1990s." The Agency contends the materials submitted by Brickyard in 1991's siting request to expand the landfill from 675 feet to 715 feet and for a lateral expansion do not serve as siting approval for any portion of the facility below 675 feet. The Agency concludes the largest part of the wedge Brickyard seeks to fill with waste was not approved by the Vermilion County Board.

¶ 45      Our finding above that new local siting approval is not required renders this argument irrelevant. Nevertheless, to the extent this argument may apply to the boundaries determination, we note the materials are not deficient in that regard. Because the development permit for Brickyard's landfill was issued before November 1981, the initial siting and the approval of the facility's boundaries were provided by the Agency. See *M.I.G. Investments*, 122 Ill. 2d at 398 (explaining the transition of the role of siting from the Agency to local governmental authorities). In 1992, when presented with a request to expand the vertical and lateral boundaries of the landfill, the Vermilion County Board provided local siting review and approved "a lateral and vertical expansion of permitted landfill boundaries, within existing property boundaries." The boundaries of the facility were properly sited.

¶ 46      E. The Groundwater Impact Assessment Finding

¶ 47        In addition to seeking an affirmation of the Board's order regarding local siting approval, Brickyard asks this court to affirm the Board's decision finding Brickyard's application presented adequate information regarding the existing GIA.

¶ 48        We decline Brickyard's invitation. In its petition for administrative review, the Agency asked for a review of the Board's determination Brickyard's application was complete. The Agency did not specify the GIA. On appeal, the Agency made no challenge to the Board's finding regarding the GIA, forfeiting any argument the Board erred on that ground. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017). We thus need not examine the correctness of that determination. The Board's decision regarding the completeness of the GIA stands.

¶ 49                             III. CONCLUSION

¶ 50        We affirm the Board's decision.

¶ 51        Affirmed.